BLALOCK v. ALLEN, Collector of Internal Revenue (three cases).

Civ. A. Nos. 251–253.

District Court, M. D. Georgia,
Macon Division.

July 19, 1944.

Bruce F. Woodruff, of Atlanta, Ga., for plaintiffs.

T. Hoyt Davis, U. S. Atty., and Chas. W. Walker and Henry S. Barnes, Asst. U. S. Attys., all of Macon, Ga., for defendant.

DEAVER, District Judge.

The foregoing cases having been submitted to the Court for trial together, without a jury, and evidence having been offered, and arguments having been made in behalf of both plaintiffs and defendant, upon consideration of the pleadings and evidence, the Court makes the following Findings of Fact, Conclusions of Law and Judgment:

### Findings of Fact

1. On or about March 1, 1939, a written partnership contract dated March 1, 1939, was signed by D. B. Blalock, his wife, Mrs. Estelle Z. Blalock, and their son, D. B. Blalock, Jr., reciting that they had been partners since January 1, 1939, and agreeing themselves to be equal partners, each owning one-third interest in a business known as Blalock Machinery and Equipment Company, dealing primarily in the sale of road machinery and equipment. No question is presented to the Court for adjudication in these cases as to the validity or bona fides of this partnership of three persons.

2. On April 1, 1939, a new written partnership agreement was executed between D. B. Blalock, Mrs. Estelle Blalock, D. B. Blalock, Jr., and A. O. Blalock, who was the father of D. B. Blalock, in which they agreed to enter into an equal partnership to carry on the same business under the same name, Blalock Machinery and Equipment Company.

3. On April 1, 1939, A. O. Blalock was seventy-nine years of age.

4. A. O. Blalock was a lawyer by profession, but had given more time to business and other type activities than to the active practice of law. He had been an officer and part owner in a bank which failed in 1927, thus precipitating his bankruptcy. Prior to that time, he and his son, D. B. Blalock, had operated an undertaking establishment in Fayetteville, Georgia, which they sold after operating it about ten years. He served as Collector of Internal Revenue for the District of Georgia during Woodrow Wilson's two administrations, and was a member of a partnership engaged in tax practice for several years after he retired from his position as Collector of Internal Revenue. From 1935 to 1937 he was a field representative for the Federal Housing Administration, traveling over a number of counties in Georgia at a salary ranging somewhere between $1800 and $2600 a year. In the latter part of 1937 he was appointed Chairman of the Penal Board for the State of Georgia, which position he held until the spring of 1939. This was a part-time employment paying him $7 a day for the days that he worked, which averaged about two days a week.

5. In 1938 A. O. Blalock was employed by Blalock Machinery and Equipment Company at a salary of $5000 a year, with no allowance for travel expenses, there being no intention that he travel for the firm; only $3600 of this was allowed for income tax purposes.

6. The partnership agreement signed by A. O. Blalock with the other members of the family had the following provision in it: "Should the said A. O. Blalock die during the life of the partnership, his one-fourth interest shall pass to the said D. B. Blalock and shall not work a dissolution of said firm."

7. For his one-fourth interest in the partnership, A. O. Blalock executed three promissory notes, each in the approximate amount of $10,000, one in favor of each of the other three parties to the contract. On April 1, 1940, by book entries on the partnership books, the notes were paid out of the unwithdrawn earnings in the partnership standing to the credit of A. O. Blalock. The amount of the notes had been determined by the bookkeeper, who had been instructed to figure the book value of a one-fourth interest in the partnership. It was later discovered that he had failed to make allowance for withdrawals from the partnership during the first three months of 1939. When this was discovered, correcting book entries were made so that the ultimate result was that A. O. Blalock paid to each of the other three members of the family approximately $5000 instead of approximately $10,000.

8. An analysis of the partnership books revealed that A. O. Blalock did not draw out any money until five months after the contract was signed, and during 1939 he withdrew $6496.34. An analysis of these withdrawals indicates that only $678.59 of it was apparently used by him for his own personal purposes. $625 of it was one-

268

fourth of the amount paid by the partnership on notes payable in the amount of $2500. $5192.75 was charged against him on the partnership books on December 31, 1939, with an explanation that this was his one-fourth of commissions collected in 1939, which commissions were retained by D. B. Blalock and used in the interests of the partnership or distributed to the partners. These entries were made from the memory of D. B. Blalock at the end of the year's operation.

9. During the four years and approximately seven months A. O. Blalock was purportedly in the partnership, an analysis of the partnership books indicates that he withdrew for personal use a total of $2129.-11, a large part of the amounts of money withdrawn by him as shown by the books being for the purpose of paying federal and state income taxes on his reported income, which was predominately from Blalock Machinery and Equipment Company. The other items charged against him on the books were either for one-fourth of certain partnership expenses or business, or were to reflect one-fourth of the commissions collected by D. B. Blalock and retained by him which were at the end of the year charged equally against the partners as having been used for the benefit of the partnership, or having been distributed equally among the partners.

10. During 1939 and 1940, D. B. Blalock received substantial remittances from machinery manufacturers, cashed the checks and retained the money personally. At the end of 1939, D. B. Blalock had book entries made so as to charge $5192.75 to each of the four partners, and at the end of 1940 he had book entries made so as to charge $12,164.75 to each of the other three members of the family, and had an entry made so as to charge himself with $13,875.76, all for the funds so retained by him. No satisfactory evidence was presented to prove that any of this money was actually distributed among the partners.

11. D. B. Blalock, during 1940 and subsequent years, had a substantial brokerage account on margin with Merrill, Lynch, Pierce, Fenner and Beane in his own name. He testified that the money used for this purpose was money belonging to the partnership which he had collected and retained, and he testified that the stocks so purchased were owned by the partnership. However, the partnership books did not reflect these transactions, and the dividends from those stocks were not returned as partnership income. They were returned by D. B. Blalock as his own personal income. There was a time during 1940 when D. B. Blalock turned over to the partnership a substantial amount of money which he testified was cash realized from the sale of some of the stock which had been held in the brokerage account in his personal name.

12. At the end of each year, even though the partners had withdrawn different amounts of the earnings of the partnership, closing entries were made on the books charging or crediting the respective partners so as to indicate on the closing statement and the balance sheet that each partner had withdrawn an equal amount from the partnership, and so as to show their capital investment in the business as being equal. No provision was made by which a partner who was overdrawn should pay interest to the partnership, or by which a partner who left most of his earnings in the partnership business should draw interest. When A. O. Blalock died in November, 1943, all of these fictitious book entries had to be reversed in order to determine the actual amount of unwithdrawn profits of A. O. Blalock which were still in the partnership business.

13. At the death of A. O. Blalock, he had in the partnership unwithdrawn profits of slightly more than $110,000. Without waiting for the qualification of the executor of A. O. Blalock, this amount of accumulated profits of A. O. Blalock was transferred on the books of the partnership to the credit of D. B. Blalock and was thereafter treated as property of D. B. Blalock.

14. A. O. Blalock left a will executed January 14, 1942, in which he left to D. B. Blalock all of his right, title and interest in the partnership known as Blalock Machinery and Equipment Company, together with all notes or obligations of any of the partners "which may be due to me by said" partnership "or said individuals composing said" partnership. It provided further that in the event D. B. Blalock should predecease him, then his interest in or claims against the partnership or its partners should go to Mrs. Estelle Z. Blalock, and in the event that she also should predecease him, then to go to D. B. Blalock, Jr. The will left A. O. Blalock's home place in Fayetteville, Georgia, to his daughter, Mattie Lena Ingram. She lived in the home with him, and in fact, this home place was

already standing in her name on the deed records. All the rest of his property was devised equally to his five children, including D. B. Blalock.

15. During the four years and seven months that A. O. Blalock was in the partnership, there were no substantial deposits in his bank accounts, with the exception of one deposit slightly in excess of $1600, and he made no large or substantial investments. He continued to live a conservative type life. There was nothing to indicate that he was receiving or using substantial profits from the Blalock Machinery and Equipment Company.

16. During 1939 A. O. Blalock was not authorized to sign checks on the partnership bank account. Some time during 1940 the bank was authorized to honor checks upon his signature, as well as upon the signature of each of the other partners. This was after the Revenue Agents had begun the investigation to determine whether or not a bona fide partnership existed. He never signed any checks on the partnership.

17. The partnership as to A. O. Blalock was not genuine, but was merely a formal partnership.

18. The only apparent motive or motives for taking A. O. Blalock into the partnership was the desire to take care of a highly respected, aged relative, by making him a partner in name but not in reality, or a desire to lessen income taxes, or both; which motives in connection with what was actually done, while not rendering the arrangement illegal or subject to criticism, yet for income tax purposes did prevent it from becoming a real or genuine partnership.

### Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter.

2. A. O. Blalock for some purposes would probably be held to be a partner but for income tax purposes he was not a partner.

3. Plaintiffs are not entitled to recover from defendant in these suits.

### Judgment

Whereupon, it is considered, ordered, and adjudged that D. B. Blalock, Mrs. Estelle Z. Blalock, and D. Braxton Blalock, Jr., plaintiffs in these suits, take nothing from Marion H. Allen, Collector of Internal Revenue, defendant in these suits; and that the plaintiffs be taxed with all costs herein expended, which are to be assessed by the clerk of the Court.